I would like to reserve three minutes for rebuttal, if that's possible. Please watch the clock. Thank you. May it please the Court, my name is Dimitri Eglitsen, representing IATSE State Chance Local 15. I want to begin today by first noting what the National Labor Relations Board got right in its decision below, and using that to explain where we believe it ultimately erred in part. The Board got right the fact that after the employer made claims in support of its wage proposal about its current contracts with hotel clients and the rates it charged to event clients, and Union Council requested specific financial information needed to assess those claims, the Board properly held that PSAV violated the Act by not providing that information. What was the basis for that? I was confused, because I thought originally the reason they had to provide that information was because the employer had said this is going to affect, it's going to be detrimental to our business, we have an inability to pay. Or, excuse me, yeah, then they took that back, they retracted that statement, and the NLRB said it was a proper retractment of the statement. So once they retracted, then why was there another basis? Great question. I think it's two really separate things. What the Board says, what we agree with, and now I'm quoting from page two of the Board's decision, is that Schenkman, the attorney for PSAV, made a number of specific claims to support the respondent's position that it only wanted to pay the wages it was already paying and only wanted to change those wage rates if it felt like changing those wage rates. The Board says, Schenkman made a number of specific claims to support the respondent's position, including that respondent pays 50% commissions and so on and so forth. And in the discussion around that, the Board correctly notes the general rule from the Truett Manufacturing Company U.S. Supreme Court decision from 1956 that good faith bargaining necessarily requires that claims made by either bargainer should be honest claims. If an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy. So when Schenkman makes these specific claims, PSAV is obligated to prove up or fail to prove up or make some effort to show the factual basis for those specific claims. And that's the distinction the Board makes that we don't disagree with. So the Board indicated that, first of all, that, as Judge Nelson said, it was a proper retraction. As to the bullet points two to four, I think it said that wasn't in bad faith because the company could have reasonably concluded that that information, too, was to support an inability to pay. So do you disagree with that analysis? I do disagree with that analysis, but it's ultimately not really relevant today. The Board found, and no one contests here on appeal, that the failure to provide bullet points two through four was a breach of the duty to bargain in good faith. Even if you can't infer some kind of larger bad will or intent, it is on its face a breach of the duty to provide the information that you've raised in bargaining. Right. The Board said that that was a breach of your duty to provide information, but not a breach of the duty of good faith. I mean, that's why we're here, right? So it's all a breach of Section 8A.5 of the Act, but you're correct. The Board characterized that as a breach of the Act by failing to provide the information, but not an overall breach of the duty of bargaining in good faith. But I think the question that you just received was, what about how the Board, or I'm sorry, how the employer reached its belief that it didn't need to provide these two through four documents? What about their conduct shows that that was a bad faith action? And that is actually not an argument that I'm taking issue with today. So I want to be clear. So you're not arguing as part of your good faith argument the document issue? I'm not arguing that document issue on its own except to say this. If we want to, the thrust of my verbal remarks, and I think frankly Member McFerrin does a good job in his dissent of articulating the overall bad faith bargaining argument, is that where the Board first got it wrong after finding that it was a violation of the Act to not provide bullet points two through four, where the Board got it wrong was in thinking that the employer ever retracted its statement of inability to pay. And that's just a legal error by the Board. So Shenkman says this is not an inability to pay for lack of revenue. It's a refusal to pay an hourly rate that would be detrimental to the business. So he expressly says this is not an inability to pay. Well, he says that, but right before that he purportedly clarified. So what was the inability to pay remark? According to the Board, it was it would be suicide for us to pay these rates. What's his clarification in the sentence right before that? No employer in this business would pay such a wage. If it did so, it would be suicide for that company. Well, PSAB is an employer in this industry. He's actually not retracting the suicide comment. He is doubling down on it. Following it with a purely conclusory statement, we're not saying we're unable to pay, but he's just said it would be suicide. So we submit that the Board misunderstood, and under this Court's decision in the International Chemical Workers Union Council case, a company must make it, quote, Attorneys can be very clever with their words, but when you say, I didn't mean it would be suicide, I meant it would be suicide for us, I meant it would be suicide for anyone in the entire industry, which includes us, that is not a retraction. That is doubling down. And following up by saying, I'm not saying we're unable to pay, that's just checking off a box to try to avoid being held responsible. It does beg the question of what inability to pay means. You can have the revenue to be able to pay, but then you know that that would hit your bottom line and you wouldn't be able to make any profit. So is there somewhere where inability to pay is actually defined in the regulations or somewhere else? It's defined by the Board in actually a case that Shankman cited in his email, this AMF trucking and warehousing case, 342 NLRB 1125. Inability to pay means that the company presently has insufficient assets to pay or that it would have insufficient assets to pay during the life of the contract that is being negotiated. Thus, inability to pay is inextricably linked to non-survival in business. And then he quotes that and goes on and says, no such claim of inability to pay was ever made. Right, but to me that's just empty words because he's actually repeated that claim. To say it would be suicide fits exactly. I don't know that I agree with you because, I mean, you're in a business. It's easy to say it's suicide that we would only make 1% profit instead of 10% profit, but that doesn't mean that there's an inability to pay. He could say it's suicide for my job. If I pay you this much, the Board's going to fire me for my job, but not because the company's going to go under, just because I'm not going to meet my benchmark. But respectfully, it's actually the Board below that agrees with me on that point because the Board actually gets this right on page 4. They say, Shankman's statements during the August 17 bargaining session, particularly his statements that accepting the union's initial wage proposal would be, quote, suicide, end quote, for the respondent. It would cause it to go, quote, underwater, end quote, indicated that the respondent's business would not survive if the respondent accepted the union's wage proposal and therefore could not. That's a fair point. I mean, I think the underwater part probably helps that a little bit more than just the suicide part. I mean, I think they go together. But it goes, the Board says, you know, goes on to say, and it quotes the Shell Company, which talks about the situation was critical and a matter of survival, and therefore we agree with the judge that the respondent claimed inability to pay during the August 17 bargaining session. Right, but that's the key point, is it's survival of the company. And what the statement here was, it would be detrimental to the business. Detrimental is a, there's a huge range of possible consequences that could be detrimental. That's one of the words. But my position, and I don't want to belabor the point, is that by repeating it would be suicide, the Board has not explained why saying it's suicide on August 17 is an assertion of inability to pay, saying it would be suicide for anyone in our industry, implicitly us as well. Did he say suicide again in the retraction part? The Board says no employer in this business would pay such a wage, and if it did so, it would be suicide for the company. So that's why I submit it's doubling down. All right. Big picture on the bargaining in bad faith is you've got a company coming to the table with a wage offer, which is we're going to pay what we're paying now and give people wages when we feel like it. We're going to discipline people if we have a reasonable belief, which is not something a union can meaningfully contest, that we should discipline them. We're going to give them the benefits we're giving them now, which are whatever benefits we're giving non-represented people. You're running out of time. Do you want to save that for rebuttal? I will. Actually, let me just say, the union makes a counteroffer of $2 less on wages, and the employer never responds with any proposals, and that's where it matters. It also doesn't give the union information that might have changed the union's position. But that's one of your good faith arguments.  Thank you. May it please the Court. Kelly Isbell here on behalf of the National Labor Relations Board. There are two issues here. Did the company effectively retract its inability to pay claim, and did it engage in bad faith bargaining? Substantial evidence supports the Board's findings that it did effectively retract, and it did not engage in bad faith bargaining. So on the issue of the retraction of the inability to pay claim, the Board did explain why it found that retraction to be effective. Yes, the word suicide was used twice, but remember the first time Shankman made his suicide comment was in bargaining. He said their contracts were precarious, and they would go underwater if they paid those wages. When he explained in his letter, he set out that what he was really talking about was the business model. The union had based its wage ask on as-needed union hiring hall contracts in San Diego and San Francisco, not in-house 40-hour-a-week full-time employees that the company had employed in the Seattle office. So Shankman explained the difference in the business model and why those wages were inappropriate in the Seattle market. That's enough. What then happened was that the Board looked at the entire context of continuing statements by the company and their conduct. Inability to pay in chemical workers in other cases is defined as making a plea of poverty, being in financial distress. That is not what this company was claiming. They were making the point that the business model they used in Seattle was a different model than the one in San Diego and San Francisco. So once they explained that, they never then again said we're in financial trouble. They didn't, as companies in the Fairhaven case, didn't go on to do things like ask for give-backs or lay off people. That's what happened in international chemical workers. So the Board and the courts are looking at the entire context of the company's bargaining position to find out whether or not the inability to pay claim was effectively retracted. I have a question for you. Coming into this argument, my understanding was that the union was arguing that failure to provide these two through four category documents was an aspect of bad faith. I'm not sure at this moment. But in any event, let's assume that that's the case. So, I mean, they didn't, you would agree that the employer stuck with the argument about these different market models between California and Seattle and why they were taking this position. You would agree that they stuck with that argument, right? Yes, Your Honor. And so then why isn't it bad faith for them not to provide the documentation related to those arguments as part of the bargaining process? Information request violations. This is part of one of the interesting bits about the Act. The Board does not have to find intent or motive. So if the Board finds that information requested by the union is necessary and relevant to the bargaining process and the company did not provide it, then the company violates 8A5. The Board does not need to look at the motive. So here, the information in bullet points two through four was necessary and relevant for the union's bargaining. It's very specific information. The Board told them to provide it, but the Board didn't need to find a bad faith bargaining. And that's not before us, right? I mean, the two through four, the company's going to have to provide that no matter what we decide here. Okay. Yes, Your Honor. But the Board then went on as part of its bad faith. So there are two issues, retraction, inability to pay. Do we have to open our books? That's bullet point one. When you make an inability to pay claim, you have to open your books to the union. And then two, bad faith bargaining. And sometimes when the Board is doing a bad faith bargaining analysis, it will look at other things. And if there's a corollary refusal to provide information, the Board may consider that in making its bad faith finding termination. But here it found that refusing to provide two through four was not in bad faith. It was not disingenuous because they believed the union had couched all the requests for the inability to pay, and once they retracted, they didn't have to provide it. So the Board found it wasn't in bad faith because then they continued to – they didn't make other claims that they were in financial distress, so there was no ongoing inability to pay claim. Does that answer your question, Your Honor? It does. Okay. So if there are no more questions about retraction, inability to pay. Bad faith bargaining. So when the Board is looking at claims of bad faith bargaining, it's looking at the entire context of what happened. The Board doesn't normally look at individual proposals on either side, but it will in the bad faith context to figure out what's going on. Good faith bargaining means you have a desire to reach agreement. Bad faith bargaining means you have no real intent of ever reaching an agreement. And the Board looks a lot at objective factors such as, did you delay in setting up the meetings or giving proposals? Did you send people to the negotiations who had no authority? Did you make regressive bargaining proposals, offer something in the beginning and then six months later take it away? Things like that. We don't have that kind of bargaining in this case. What we have are five sessions. The first session devoted to setting the ground rules, so there were really only four sessions of bargaining. Both sides submitted proposals and counterproposals. The company moved on subcontracting, discipline, grievance and arbitration. It gave up some of its discretion in setting starting wages for employees. It did not move on benefits. But there was no indication that the company had no intention of reaching an agreement. It came to the table. It made proposals. They reached tentative agreements, so they had set aside some of the non-economic proposals that they had agreed on. So one thing that I'm curious about in this area of the law is there's these sort of tensions in that the law doesn't require parties to reach an agreement, but the law requires parties to make an effort. Hard bargaining is not illegal, but those things at some point sort of clash. If we look at just wages here, the record does show that the employer didn't move much on wages. I think fairly the union didn't move much either. So how would you explain where we find that tension between what's hard bargaining and what's I'm not interested in actually having this be fruitful? Well, with these facts, I think what you have is you can't tell yet. We only had four sessions. I mean, this is where the board said you have to test the employer's willingness to bargain, and they haven't been tested yet. With one issue of hard bargaining on both sides, I agree with you, Your Honor. I mean, the union came down by $2, so its second wage proposal was still 106 percent wage increase. The company didn't need to accept that, and I can't tell, for example, on the benefits issue from the record whether or not they ever discussed the benefits issue. The company proposed keeping benefits the same for all their workers so the unionized workers would have the same benefits like medical insurance and things like that as their non-unionized workers. And the union proposed paying into the union funds. Neither side moved. There were no other offers on the table. But just that issue doesn't mean that either side was not interested in reaching agreement. How much deference is the board's determination on this sort of issue? How much deference do we give to them? The board gets considerable deference. I mean, on issues of interpreting the act, considerable deference on issues of whether or not the board properly dismissed parts of the complaint, as it did in this case. This court applies the rational basis standard. And I would say that here we have substantial – the board's findings are supported by substantial evidence. I don't see anywhere where the board hasn't backed up what it found with evidence in the record. The cases show when the board finds bad-faith bargaining that companies have done things like insisted on being able to make unilateral changes throughout the life of the contract to discipline, wages, work rules, along with the no-strike clause. Public service – the public service case out of Oklahoma and HydroTherm, I believe, both insisted on converting ULP strikes and for labor practice strikes into economic strikes as a part of the contract. When the board finds bad-faith bargaining, companies have done things like reached out to employees to say, you know, if you're ready to get rid of the union now, come talk to us. So it's a whole package of employer behavior. And what we have here are four bargaining sessions, both sides coming together, not having a meeting of the minds yet on wages, but no indication that either side was unwilling to continue to bargain and no indication that the company said it wouldn't raise wages. We just know it thought that the 120 percent wage increase was too much. I'm almost out of time if there are no further questions. Apparently not. Thank you. The employer made wage proposal, benefit proposal, discipline proposal. The union came to the table and – I'm sorry, the union made its initial proposals. The employer came up with its proposal. The union came back and said, here's a new wage proposal, $2 an hour less, plus we want information. The employer never made a counter, never provided the information, never changed its other proposals. That is not hard bargaining. That is a refusal to bargain in good faith. Thank you. Okay, we thank both sides for their argument. The case of IATSD Local 15 versus National Labor Relations Board is submitted and we're adjourned for this session.
judges: Ikuta, R. Nelson, Hunsaker